**BANK OF PALM BEACH AND TRUST COMPANY, Plaintiff-Appellee,**

v.

**The NORTH AMERICAN COMPANY FOR LIFE, ACCIDENT AND HEALTH INSURANCE, Defendant-Appellant.**

No. 28226.

United States Court of Appeals, Fifth Circuit.

May 8, 1970.

Rehearing Denied June 4, 1970.

———◆———

James E. Tribble, R. Layton Mank, Miami, Fla., for defendant-appellant.

Kirk Sullivan, West Palm Beach, Fla., for plaintiff-appellee.

Before TUTTLE, WISDOM, and GOLDBERG, Circuit Judges.

WISDOM, Circuit Judge:

This diversity case involves the interpretation of a group life insurance policy. On the basis of the stipulated facts and a joint motion for summary judgment, the district court awarded summary judgment in favor of the Bank of Palm Beach and Trust Company, beneficiary of Oscar Amison. We reverse,

6. We do not find it necessary to consider Seeburg's contentions regarding alleged patent misuse by Eastern.

holding that Florida law allows a change in the conditions of eligibility without the consent of the individual insured.

## I.

Oscar Amison, an insurance agent of North American, was insured under a group life insurance policy issued by North American as the insurer to North American as the policyholder. Paragraph 14 of the policy provided that "[t]he Policy holder [North American, as employer] may terminate this policy at any time by giving to the Company [North American as insurer] prior notice". The certificate of insurance issued to Amison provided that his insurance would terminate upon "termination of his membership in the class or classes eligible for insurance under the group policy".

The amount of insurance provided for under the certificate was $10,000 basic, non-contributory insurance plus a sliding scale of supplementary contributory insurance based upon the amount of total commissions earned in the fiscal year. For fiscal year total earned commissions of $5,000–$10,000, the supplementary contributory insurance amounted to $7,-500. To qualify for coverage after March 31, 1968, an agent had to earn $5,000 in commissions during the 1967 fiscal year. Originally, the $5,000 figure had included first year and renewal commissions. November 9, 1967, however, North American notified its agents that effective October 1, 1967, only first year commissions could be used to meet the $5,000 requirement.[1]

Amison earned total commissions, first year and renewal, of $9,600.01 during fiscal 1967, but only $254.38 of that amount was attributable to first year commissions. North American, therefore, considered Amison's coverage to have lapsed March 31, 1968. (The last premium paid and charged to Amison's account was for the month of March.) Amison died April 9, 1968. The Bank now seeks to recover as the named beneficiary under the certificate.

## II.

The parties agree that Florida law allows an employer who is insured under a group policy to cancel or modify the group policy without his employees' consent, when the contract so provides. *See* Kimbal v. Travelers Insurance Co., 1942,

---

1. On November 9, 1967, North American mailed to Amison, by U. S. mail directed to his correct address, "General Agents' Bulletin AD–13–67". The Bulletin contained the following statement:

> "It is our pleasure to send you a revised, up-to-date copy of the outline of the rules and regulations pertaining to the Group Insurance Plan for Field Sales Personnel. In this outline you will find eligibility requirements for participants in the Plan; a description of the coverages available; the costs involved; definitions and the limitations of the Plan. Changes indicated herein are effective October 1, 1967.
> We call your particular attention to certain important and significant changes:
> \* \* \* \* \*
> 3. Continuing eligibility to participate depends upon *first year* commissions of at least $5,000 in each fiscal year.
> 4. All coverages terminate on April 1 following the fiscal year in which the participant fails to maintain eligibility
> \* \* \* " (emphasis supplied).

The amendments to the group insurance plan attached to the General Agents' Bulletin contain the following material changes:

> "V. CONTINUING ELIGIBILITY
> A. Basic Group Life, Hospital and Major Medical Plans.
> 1. Participants will remain insured provided total *first year commissions* of at least $5,000 are earned in each fiscal year.
> B. Supplementary Life Plans
> 1. Participants will become or remain insured in accordance with the schedule of total earned commissions in each fiscal year.
> VII. TERMINATION
> All insurance coverages, including the Supplementary Life Plan will terminate on General Agents, Associate General Agents, Assistant General Agents and Agents on April 1 of the year following the calendar year in which a participant fails to maintain the continuing eligibility requirements." (emphasis supplied).

151 Fla. 786, 10 So.2d 728; Annot., 68 A.L.R.2d 249, 253, 258 (1959). We find no reason to treat any differently a company that insures its agents. Thus, paragraph 14 of the policy would allow North American as policyholder to terminate the insurance at any time. Florida law apparently does not even require notice of such cancellation or modification. *See* Kimbal v. Travelers Insurance Co., *supra*. At any rate, North American's November notice to its agents was adequate to permit them to make provision for other coverage if need be.

The Bank, however, would eliminate North American's rights as policyholder under the policy and limit it to its rights as insurer. As insurer, North American could terminate the policy only on the policy anniversary (July 1), and then only if it gave 30 days notice to the policyholder (North American). To reach this result, the Bank insists that any contract North American attempted to make with itself is by definition a nullity, but that an enforceable contract exists between North American as insurer and Amison as insured. Under this latter contract North American would be limited to the rights it would have as the insurer under the nullified contract. The Bank argues, therefore, that North American could not alter the terms of qualification without Amison's consent.

The Bank, as the beneficiary of Amison, cannot assert *its* right under the group policy and at the same time assert that the policy is a nullity insofar as the rights of North American are concerned. Amison, having asserted coverage under the policy is bound by its terms. Whatever the legal significance of North American's "contract" with itself and whatever implied contract might have arisen between Amison and North American, we see no basis for granting Amison greater rights than Florida law would grant him under the terms of the policy. Under the group

policy, North American could discontinue its policy at will. No conversion rights has accrued to Amison when the change in coverage occurred, and the period covered by his premiums had expired. "If there was no contractual obligation upon the employer or insurer to keep the entire master policy in effect, the *plan could be modified to the extent that certain classes of the employees could be eliminated from coverage. That is to say, the greater power would necessarily include the lesser.*" (emphasis supplied.) Metropolitan Life Insurance Co. v. Korneghy, 1954, 37 Ala.App. 497, 71 So.2d 292, cert. dismissed 260 Ala. 521, 71 So. 2d 301. We conclude that North American could legitimately terminate coverage for Amison, without his consent, when he did not meet its standards.

We reverse the decree and the award of attorneys' fees below, and remand with directions to enter judgment for North American.[2]

---

**2.** Because we reverse and remand, we deny also the Bank's motion to affirm and its motion for attorneys fees on appeal under Fla.Stat. 627.0127, F.S.A.